# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

IN THE MATTER OF THE EXTRADITION OF
    GRACE CHAN SEONG-I,
    A/K/A CHAN SEONG-I,
    A/K/A GRACE CHAN,
    A/K/A GRACE S. CHAN,               Misc. No. 02-25 WJ
    A/K/A GRACE STEVENSON,
    A/K/A GRACE S. STEVENSON, AND
    A/K/A GRACESEONG STEVENSON,
A FUGITIVE FROM THE HONG KONG SPECIAL
ADMINISTRATIVE REGION OF THE PEOPLE'S
REPUBLIC OF CHINA.

## MEMORANDUM OPINION AND ORDER ON EXTRADITION

THIS MATTER comes before the Court pursuant to the Complaint [Docket No. 1]

seeking the extradition of Grace Chan Seong ("Ms. Chan") from the United States to the Hong

Kong Special Administrative Region of the People's Republic of China.

## FACTUAL BACKGROUND

Ms. Chan, the Relator in this matter, is a U.S. citizen residing in the United States.  She

has been charged in Hong Kong with the crime of Accepting Advantage as an Agent in violation

of Section 9(1)(b) of the Prevention of Bribery Ordinance of the law of Hong Kong, a statute that

criminalizes private commercial bribery.  Ms. Chan's alleged conduct occurred in 1994.  At that

time, Ms. Chan was employed by Honeywell Ltd. in Hong Kong as the Financial Controller.

While in this position, she is alleged to have accepted money from George, Gilbert and Partners

Design Consultant Limited (GGPD) and, in return, to have assisted GGPD in securing contracts

with Honeywell.

**PROCEDURAL HISTORY**

An arrest warrant for Ms. Chan was issued on December 19, 2001 by the Magistrate Court at Eastern Hong Kong.  On January 17, 2002, the Hong Kong Department of Justice submitted a formal extradition request to the United States.  The Complaint in this matter was filed on October 7, 2002 by Assistant United States Attorney Robert Kimball, acting for and on behalf of the Government of the Hong Kong Special Administrative Region of the People's Republic of China.  Concurrently filed with the Complaint were three volumes of supporting documents from the Hong Kong Special Administrative Region.  These documents were properly authenticated in accordance with the Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr. Brit., S. Treaty Doc. No. 105-3, the treaty at issue in this case and are properly considered by this Court in its determinations in this matter.

The Complaint filed on October 7, 2002 sought the arrest of Ms. Chan in order that she be brought before the Court for a determination of whether the legal requirements for extradition are met in accordance with 18 U.S.C. § 3184 such that she is subject to surrender.  An arrest warrant was issued by this Court on October 7, 2002, and Ms. Chan was arrested pursuant to that warrant on October 16, 2002.  A hearing on the matter was held on May 21 and 22, 2003.

**LEGAL STANDARD**

Extradition is governed by 18 U.S.C. §§ 3181 and 3184.  Under § 3181, in order to extradite an individual, the requesting government must establish (1) the existence of an extradition treaty between the United States and the requesting government; (2) that charges for which extradition is sought are extraditable under the treaty; (3) that the Relator is the same individual charged by the requesting government; and (4) that there is probable cause to

determine that crimes have been committed and to believe that the Relator committed them. <u>Ross v. U.S. Marshal</u>, 168 F.3d 1190, 1193 (10th Cir. 1999); <u>U.S. v. Kin-Hong</u>, 110 F.3d 103 (1st Cir. 1997); <u>Republic of France v. Moghadam</u>, 617 F.Supp. 777 (N.D. Cal. 1985). Under 18 U.S.C. §§ 3181 and 3184, a judicial officer's inquiry is limited to this narrow set of issues. <u>Kin-Hong</u>, 110 F.3d at 110. The broader assessment of extradition and its consequences is committed to the discretion of the United States Secretary of State. <u>Id.</u>

**DISCUSSION**

The government and Ms. Chan have stipulated to the identity element of the extradition requirements; Ms. Chan is the individual sought by the government of Hong Kong for the charges of Accepting Advantage as an Agent. This Court concludes that it has jurisdiction over the person of Ms. Chan. Ms. Chan contends, however, that the government cannot meet its burden of showing probable cause, cannot show that there is a valid treaty for extradition from the United States to Hong Kong, and cannot show that the charges fall within the extradition treaty. Additionally, Ms. Chan argues that extradition would violate her substantive and procedural due process rights and that the extradition statute violates the separation of powers doctrine of the Constitution of the United States of America. Finally, Ms. Chan urges that extradition should be denied based on humanitarian concerns.

I.    THE COURT LACKS JURISDICTION TO DENY EXTRADITION ON THE BASIS OF HUMANITARIAN CONCERNS.

The Court is deeply concerned that Ms. Chan was pregnant at the time of the extradition hearing and has small children at home.[1] Thus, if I had jurisdiction, I might deny extradition based

---

[1] The Court was informed by the Federal Pre-Trial Services Officer that Ms. Chan had a miscarriage subsequent to the extradition hearing.

3

on humanitarian concerns.  However, as noted above, this Court's inquiry is limited to issues

concerning the existence of a treaty, the offense charged, and the quantum of evidence offered.

Hin-Kong, 110 F.3d at 110.  Whether humanitarian concerns should preclude extradition is an

issue committed to the sole discretion of the executive branch, specifically the Secretary of State.

See Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr.

Brit., S. Treaty Doc. No. 105-3, Art. 7.  Thus, this Court is without jurisdiction to consider Ms.

Chan's arguments with regard to humanitarian concerns.

II.     CONSTITUTIONALITY OF 18 U.S.C. § 3184

        Ms. Chan contends that 18 U.S.C. § 3184 is unconstitutional because it violates the

doctrine of separation of powers.  At least one court faced with this argument has determined that

a United States District Judge, acting in the capacity contemplated by 18 U.S.C. § 3184, should

not address challenges to the constitutionality of the statute.  In re Extradition of Lahoria, 932

F.Supp. 802 (N.D. Tex. 1996).  However, every other court that has been faced with the issue has

addressed it.  Therefore, I will consider Ms. Chan's argument.

        Ms. Chan essentially adopts the reasoning of Lobue v. Christopher, 893 F.Supp. 65

(D.D.C. 1995) vacated on jurisdictional grounds, 82 F.3d 1081 (D.C. Cir. 1996).  In a scholarly

and thoughtful opinion, United States District Judge Royce C. Lamberth found that 18 U.S.C. §

3184 unconstitutionally confers upon the Secretary of State the authority to review the legal

determinations of Article III judges.  Lobue, 893 F. Supp. at 78.  Judge Lamberth pointed out that

similar legislation has been found to be unconstitutional in the past.  Id. at 72-73.

        In Hayburn's Case, 2 U.S. (2 Dall.) 408 (1792), the United States Supreme Court

declared unconstitutional a statute that required judges to certify to the Secretary of War the

eligibility of Revolutionary War veterans to receive benefits.  The Secretary of War then had discretion to either allow or disallow benefits for those veterans certified by the courts. The Supreme Court held that neither the legislative nor executive branches have any constitutional authority to assign nonjudicial duties to the judiciary, and that the duties at issue were nonjudicial because they were subject to review and revision by the executive and the legislature.  Id. at 410 n. 2.  The Supreme Court stated that it is unconstitutional for the legislative branch or an executive branch officer to sit as a court of error on the judicial acts or opinions of an Article III court.  Id.

In Gordon v. United States, 69 U.S. (2 Wall.) 561, 562 (1865), the Supreme Court struck as unconstitutional the original statute creating the Court of Claims which permitted the executive branch to revise all decisions of the Court of Claims involving the payment of money.  Based on these cases, a review of the language of the statute, and a historical review of the decisions of the Secretary of State, Judge Lamberth found 18 U.S.C. § 3184 to be unconstitutional.  Lobue, 893 F. Supp. at 78.

Judge Lamberth also looked to United States v. Ferreira, 54 U.S. (13 How.) 40 (1851), for support of his ruling.  Notwithstanding Judge Lamberth's scholarly analysis, I believe he misconstrued the holding of that case.  In Ferreira, the Supreme Court found that it did not have appellate jurisdiction to review decisions of a lower court made pursuant to a statute that directed judges to evaluate the claims of Spanish inhabitants in Florida and forward the evaluations to the Secretary of the Treasury for independent review.  Id. at 52.  The Supreme Court found that the federal courts were operating in a judicial capacity when evaluating claims; however, the judges were acting as commissioners rather than exercising Article III judicial powers.  Id. at 48. Thus,

5

there was no appellate jurisdiction in the Supreme Court to review the lower court determinations.

The holding of Ferreira and the concept that Article III judges may act in a judicial capacity but not under the powers of Article III has been relied upon by several courts addressing issues raised with respect to 18 U.S.C. § 3184.  The Supreme Court in In re Kaine, 55 U.S. (14 How.) 103, 110 (1852), had no difficulty with the concept that extradition was an executive act performed solely by the Secretary of State, but that Congress had the power to vest authority in the judiciary to arrest and commit persons in preparation of extradition.  In determining the scope of the Supreme Court's jurisdiction to issue a writ of habeas corpus, the Supreme Court noted that a district judge in an extradition proceeding is acting pursuant to special powers and not any part of the judicial power of the United States. Id. at 120 (citing to Ferreira, 54 U.S. (13 How.) at 48).  Modern courts continue to rely on the concepts expressed in Ferreira and Kaine in determining that 18 U.S.C. § 3184 does not violate the principle of separation of powers.  See In re Extradition of Kirby, 106 F.3d 855, 864 n. 11 (9th Cir. 1996) (noting that 18 U.S.C. § 3184 does not violate principles of separation of powers because a long line of precedents hold that a district judge acting pursuant to Section 3184 does not exercise any part of the judicial power of the United States); Lo Duca v. U.S., 93 F.3d 1100 (2nd Cir. 1996) (recognizing that individual judges rather than the federal courts are subject to 18 U.S.C. § 3184, that judges are thus functioning as commissioners under § 3184 rather than exercising powers under Article III, and that the statute thus does not violate the separation of powers doctrine).

There are additional reasons why a court may find that § 3184 does not violate the separation of powers doctrine.  In Carreno v. Johnson, 899 F.Supp. 624, 632 (S.D. Fla. 1995),

the court found that § 3184 is not facially unconstitutional because the Secretary of State may decline to extradite an individual for reasons that do not involve any review of the court's legal determinations.  Additionally, the court found that the statute was not unconstitutional as applied because there was no indication that the Secretary of State had reviewed the court's legal determination of extraditability.  Id.  In both In re Extradition of Marzook, 924 F.Supp. 565 (S.D.N.Y. 1996) and In re Extradition of Lin, 915 F.Supp. 206 (D.Guam 1995), the courts found that § 3184 does not violate the principle of separation of powers because separation of powers is not absolute.  The interconnected roles of the executive and judiciary under the statute do not prevent either branch from performing its constitutionally assigned role, and there is no impermissible encroachment or aggrandizement of power by either branch.

Finally, in In re Extradition of Lang, 905 F.Supp. 1385, 1401 (C.D. Cal. 1995), the court found that a relator does not have standing to challenge the constitutionality of the extradition statute.  The court first noted that the statute is not facially unconstitutional based on the doctrine of separation of powers because the Secretary of State will not necessarily review a federal judge's legal determinations in a particular case.  Id. at 1391.  The court then noted that the statute cannot be determined to be unconstitutional as applied until the Secretary of State takes action with regard to a court's determination and actually overrules the court's legal determinations.  Id. at 1392.  In the event the court does not certify a relator's extradition, the Secretary of State has no power to extradite the person.  Id.  In the event the court does certify the person for extradition and the Secretary of State overrules the court's legal determination, this works to the benefit of the relator and there has been no injury in fact.  Id. at 1392-1401.  Absent

an injury in fact, a person lacks standing to challenge the constitutionality of a statute.  Id. at 1391

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

　　　　While I do not necessarily agree with the analysis in all of the above opinions, I conclude

that 18 U.S.C. § 3184 is not unconstitutional on its face and, as applied to Ms. Chan, does not

violate the doctrine of separation of powers.

III.　　THE EXTRADITION OF MS. CHAN WILL NOT VIOLATE HER PROCEDURAL OR
　　　　SUBSTANTIVE DUE PROCESS RIGHTS

　　　　Ms. Chan urges that the delay in bringing these charges against her is a violation of her

substantive and procedural due process rights.  Ms. Chan argues that her defense has been

prejudiced by the delay because businesses are only required to keep records for seven years; thus,

any records that might have exonerated her were destroyed before Ms. Chan was even charged

with the alleged crime.  Ms. Chan acknowledges that under Hong Kong law, the crime of

Accepting Advantage as an Agent has no statute of limitations.  However, she contends that the

applicable statute of limitations arising under New Mexico state law or under federal law should

be applied.  Additionally, she asserts that the failure of Hong Kong to impose a statute of

limitations, or the failure of this Court to deny extradition based on the delay, would be inherently

unfair and would violate her due process rights.

　　　　The only case cited by Ms. Chan in support of her argument is Demjanjuk v. Petrovsky,

10 F.3d 338 (6th Cir. 1993).  In Demjanjuk, the Sixth Circuit held that the Brady rule applied to

extradition proceedings, and failure by the government to turn over to a relator upon request any

exculpatory evidence was a violation of due process.  Id. at 353.  The Court can only surmise that

Ms. Chan relies on <u>Demjanjuk</u> for the general principle that a person facing possible extradition is entitled to due process.

There is no doubt that a person facing possible extradition is entitled to procedural due process with regard to the extradition proceedings themselves.  See <u>Lopez-Smith v. Hood</u>, 951 F.Supp. 908 (D. Ariz. 1996) (stating that an individual facing loss of liberty is entitled to due process of law); <u>Application of First Nat. City Bank of New York</u>, 183 F.Supp. 865 (S.D.N.Y. 1960) (noting that extradition requires a public hearing and notice and opportunity to respond). Ms. Chan is not, however, challenging the procedures she is being afforded during the extradition process.  Rather, she is alleging that an extradition would violate her substantive and procedural due process rights because she would face trial in Hong Kong on crimes that allegedly occurred nearly nine years ago.  In essence, she is arguing that the proceedings in Hong Kong will violate her due process rights.

Generally, a person who is subject to possible extradition may not challenge the procedures afforded by the receiving government.  See <u>Martin v. Warden</u>, 993 F.2d 824 (11th Cir. 1993) (noting that defendant charged in Canada did not have a due process right to a speedy trial); <u>In re Extradition of Kraiselburd</u>, 786 F.2d 1395 (9th Cir. 1986) (noting that extradition treaty between United States and Argentina did not entitled relator to speedy trial and due process protections of the Constitution); <u>Kamrin v. United States</u>, 725 F.2d 1225 (9th Cir. 1984) (stating that a person whose extradition is sought is not entitled to due process rights underlying United States' statutes of limitation); <u>Holmes v. Laird</u>, 459 F.2d 1211 (D.C. Cir. 1972) (noting that the extradition of a person to a foreign country is unimpeded by the absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally required in trials within the

United States).  Furthermore, a court may not consider a statute of limitations defense unless a

particular treaty expressly provides that extradition must be within a limitations period.  See

Kamrin v. United States, 725 F.2d 1225, 1227 (9th Cir. 1984); Freedman v. United States., 437

F.Supp. 1252 (N.D. Ga. 1977); United States v. Galanis, 429 F.Supp. 1215 (D. Conn. 1977).

There is no provision in the treaty at issue for the application of a statute of limitations.

      Under the rule of non-inquiry, claims of lack of due process in the requesting jurisdiction

fall within the exclusive purview of the executive branch, and courts do not inquire into the

procedures which await the accused upon extradition.  See In re Extradition of Lui, 939 F.Supp.

934 (D.Mass. 1996); Ahmad v. Wigen, 726 F.Supp. 389, 412 (E.D.N.Y. 1989).  The courts

generally do not question the integrity of the judicial or legal systems of other sovereign nations.

Ahmad, 726 F.Supp. at 412.   While certain courts have recognized that there may be an

exception to the rule of non-inquiry when an accused upon extradition will be subject to

procedures or punishment so antipathetic to a federal court's sense of decency as to shock the

conscience of jurists acting under the Constitution of the United States, this Court cannot find any

case in which the exception has been applied.  See Id. at 410-413.

      In the instant case, there is nothing that shocks the conscience about the delay in charging

and extraditing Ms. Chan or the absence in the law of Hong Kong of a statute of limitations on

the charge that would cause this Court to apply the exception to the rule of non-inquiry.  See In re

Extradition of Drayer, 190 F.3d 410 (6th Cir. 1999) (finding that a fourteen year delay between

the issuance of a Canadian arrest warrant and Canada's formal request for extradition did not

violate due process); Martin v. Warden, 993 F.2d 824 (11th Cir. 1993) (certifying relator for

extradition after a seventeen year delay between the incidents giving rise to criminal charges in

Canada and the extradition); <u>Kamrin v. United States</u>, 725 F.2d 1225 (9th Cir. 1984) (finding no

due process violation when relator was charged with conspiracy to cheat and defraud in Australia,

Australian law had no statute of limitations for these crimes, and there was an eight year delay

between the charged conduct and the formal request for extradition).  The delay in this case and

the absence of a statute of limitation on the charged offenses do not violate Ms. Chan's

substantive or procedural due process rights.

IV.   THE EXTRADITION TREATY BETWEEN THE UNITED STATES AND THE
      SPECIAL ADMINISTRATIVE REGION OF HONG KONG IS VALID

        Ms. Chan argues that the treaty between Hong Kong and the United States is not a valid

extradition treaty because Hong Kong is a subsovereign of the People's Republic of China (PRC),

that there is no treaty between the United States and the PRC and that valid extradition treaties

pursuant to which courts may certify extradition under 18 U.S.C. § 3184 must be between

sovereign governments.

        This issue was directly addressed by the Second Circuit in <u>Cheung v. United States</u>, 213

F.3d 82 (2nd Cir. 2000).  The court noted that extradition is governed by 18 U.S.C. §§ 3181-

3196.  <u>Id.</u> at 87.  The court then analyzed this statute to determine whether a treaty with a

subsovereign was valid in accordance with the statute.  <u>Id.</u>  After thoughtful analysis of the plain

language of the statute, statutory purpose, legislative history of the extradition statute, and

legislative history of the treaty, the Second Circuit found that the treaty was valid.  <u>Id.</u> at 94-95.

        The extradition statute gives federal judicial officers jurisdiction to conduct extradition

proceedings based on a treaty between the United States and any foreign government.  18 U.S.C.

§ 3184.  Another section of the statute provides that the extradition statutes for surrender of

persons to foreign countries will continue in force only during the existence of a treaty of extradition with such foreign government.  18 U.S.C. § 3181.  Thus, the statute appears to equate "foreign government" with "foreign country."  The Second Circuit, based on the historic meaning of "foreign country" from the era in which this statute was passed, found that "foreign country" did not refer solely to independent foreign sovereigns; nor have valid treaties been exclusively between independent foreign sovereigns.  Id. at 89-90.  I agree with this reasoning and find it to be persuasive.  Additionally, the legislative history and plain language of the treaty establishes that the primary purpose of the treaty was to provide for extradition between Hong Kong and the United States after the reversion of Hong Kong to the PRC.  See Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr. Brit., S. Treaty Doc. No. 105-3, Letter of Transmittal and Letter of Submittal; S. Exec. Rep. No. 105-2, at 8, 11.

In Kin-Hong, the First Circuit addressed whether a person could be extradited to Hong Kong just prior to the reversion of Hong Kong to the PRC.  110 F.3d at 106.  The issue in that case differed from the issue in the instant case because, at the time of the decision in Hin-Kong, Hong Kong was still a Crown Colony of the United Kingdom and the current treaty had not been ratified by the United States Senate.  However, several statements by the court in Hin-Kong are instructive.  The Court noted that the Senate was aware of the imminent reversion when it ratified the 1986 supplemental treaty with the United Kingdom for extradition between the United States and Hong Kong, and the Senate could have sought language regarding reversion if it intended to limit the terms of the supplemental treaty.  Id.  The court also noted that the treaty at issue in this case had been presented to the Senate for ratification, and that this treaty specifically continued the extradition relationship between Hong Kong and the United States after reversion.  Id.  The

12

court stated that fundamental principles of separation of powers limit a court's role, particularly in the conduct of foreign relations which are powers constitutionally allocated to the President and Senate.  Id.

I am loathe to rewrite or invalidate a treaty that has been negotiated by the President of the United States and ratified by the United States Senate pursuant to the Constitution and laws of the United States.  Thus, I find that the Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr. Brit., S. Treaty Doc. No. 105-3, is a valid treaty, and this Court has subject matter jurisdiction over the matter of the extradition of Ms. Chan.

V.     THE OFFENSES WITH WHICH MS. CHAN IS CHARGED ARE EXTRADITABLE
       OFFENSES UNDER THE TREATY

The question of whether an offense is extraditable involves a determination of whether the offense is an extraditable crime under the particular treaty and whether the conduct is illegal in both countries.  Heilbronn v. Kendall, 775 F.Supp. 1020 (W.D. Mich. 1991).  The treaty at issue in this case enumerates certain offenses including the offense of bribery and states that fugitive offenders shall be surrendered for any of the enumerated offense provided the offense at issue is punishable by more than one year of detention under the laws of both jurisdictions.  Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr. Brit., S. Treaty Doc. No. 105-3,  Article 2(1)(xvi).  As the charged offense in this case is essentially a charge of commercial bribery, Freedman v. United States, 437 F.Supp. 1252 (N.D. Ga. 1977), it is an enumerated, extraditable offense provided it meets the dual criminality requirement by being punishable under the laws of Hong Kong and the laws of the United States by a term of imprisonment of at least one year.

13

To determine whether an offense is punishable by the laws of both nations to a treaty, a court looks first to provisions of federal law or, if none, to the law of the place where the relator was found, or, if none, to the law of the preponderance of the states.  Cucuzzella v. Keliikoa, 638 F.2d 105 (9th Cir. 1981); Heilbronn, 775 F.Supp. 1020.  In accordance with the treaty and case law, in determining whether the charged offense is an offense against the laws of the United States, the conduct at issue is analyzed without regard to the specific elements of the charged offense or the name of the offense in either country.  See Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr. Brit., S. Treaty Doc. No. 105-3, Article II(3); Collins v. Loisel, 259 U.S. 309, 314 (1922); United States v. Levy, 905 F.2d 326 (10th Cir. 1990); In re Extradition of Tang Yee-Chun, 674 F.Supp. 1058 (S.D.N.Y. 1987).  Additionally, an offense meets the dual criminality requirement "whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court."  Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr. Brit., S. Treaty Doc. No. 105-3, Article II(4)(b).

One court found that commercial bribery is not an extraditable offense because it does not meet the dual criminality requirement.  Freedman v. United States, 437 F.Supp. 1252 (N.D. Ga. 1977).  However, that case was based on a survey of the laws of various states, and these laws have changed substantially since the court in Freedman did its analysis.[2]

_____

[2]Thirty-two states, not including New Mexico, now have statutes criminalizing general commercial bribery, and at least fifteen of these states classify commercial bribery as a felony when it involves substantial amounts of money.  See Ala. Code 1975 § 13A-11-121

In In re Extradition of Lui, a magistrate judge found that the charged conduct, similar to the conduct in this case, violated the federal Wire Fraud statute, 18 U.S.C. §§ 1343, 1346.  939 F.Supp. 934, 947 (D.Mass. 1996).  The federal Wire Fraud statute criminalizes the use of any wire, radio, or television communication in interstate of foreign commerce for the purpose of executing any scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises.  18 U.S.C. § 1343.  Additionally, the term "scheme or artifice to defraud" includes any scheme or artifice to deprive another of the right of honest services.  18 U.S.C. § 1346.  The right of honest services language of Section 1346 has been interpreted as criminalizing private commercial schemes that violate a fiduciary duty.  See United States v. Welch, 327 F.3d 1081, 1109 (10th Cir. 2003); United States v. Szur, 289 F.3d

_____

(misdemeanor); Alaska Stat. § 11.46.660 (felony); Ariz. Rev. Stat. § 13-2605 (felony if value of benefit is more than one thousand dollars); Ark. Code Ann. § 4-75-208 (misdemeanor); West's Ann. Cal. Penal Code § 641.3 ( felony punishable by a term of imprisonment for more than a year if the amount of the bribe exceeds one thousand dollars); Colo Rev. Stat. Ann. § 18-5-401(felony); Conn. Gen. Stat. Ann. § 53a-160 (misdemeanor); Fla. Stat. Ann. § 838.15 (felony); Haw. Rev. Stat. § 708-880 (felony when the value of the benefit exceeds one thousand dollars); 720 Ill. Comp. Stat. 5/29A-2 and 720 Ill. Comp. Stat. 5/29A-3 (misdemeanor subject only to a fine); Iowa Code § 722.10 (felony); Kan. Stat. Ann. § 21-4405 (felony); Ky. Rev. Stat. Ann. § 518.020 (misdemeanor); La. Rev. Stat. Ann. § 14:73 (misdemeanor); Mass. Gen. Laws ch. 271 §39 (felony subject to five years imprisonment); Mich. Comp. Laws § 750.125 (misdemeanor); Minn. Stat. § 609.86 (felony subject to five years imprisonment if value of benefit exceeds five hundred dollars); Miss. Code Ann. § 97-9-10 (misdemeanor); Mo. Rev. Stat. § 570.150 (misdemeanor); Neb. Rev. Stat. § 28-613 (misdemeanor); Nev. Rev. Stat. § 207.295 (misdemeanor); N.H. Rev. Stat. Ann. § 638:7 (felony if the value of the benefit exceeds one thousand dollars); N.J. Stat. Ann. § 2C:21-10 and § 2C:43-6 (felony subject to imprisonment for between five and ten years if the value of the benefit exceeds seventy-five thousand dollars); N.Y. Penal Law § 180.08 (felony when value of benefit exceeds one thousand dollars and causes economic harm to the principal in an amount exceeding two hundred and fifty dollars); N.C. Gen. Stat. § 14-353 (misdemeanor); N.D. Cent. Code § 12.1-12-08 (felony); 18 Pa. Cons. Stat. § 4108 (misdemeanor degree); R.I. Gen. Laws 1956 § 11-7-3 (unable to determine penalty); S.D. Codified Laws § 22-43-1 (misdemeanor); Utah Code Ann. 1953 § 76-6-508 (misdemeanor); Va. Code Ann. § 18.2-444 (misdemeanor); Wash. Rev. Code § 9A.68.060 (felony).

200, 209 n. 3-5 (2nd Cir. 2002); United States v. Rybicki, 287 F.3d 257, 264 (2nd Cir. 2002) (holding that Section 1346 criminalizes schemes in which a defendant breached or induced the breach of a duty owed by an employee or agent to his employer or principal that was enforceable by an action in tort).

It is apparent that the Wire Fraud statute, 18 U.S.C. §§ 1343, 1346, makes the conduct allegedly committed by Ms. Chan in Hong Kong criminal under the law of the United States.  The Wire Fraud statute provides for imprisonment for up to 20 years.  18 U.S.C. § 1343.  Thus, the conduct is punishable in both Hong Kong and the United States for a term of imprisonment exceeding one year.  The requirement in the Wire Fraud statute that an offender have used the wires is merely jurisdictional and, in accordance with the treaty, does not defeat the dual criminality of Ms. Chan's conduct.  The offense with which Ms. Chan is charged in Hong Kong is thus an extraditable offense under the Agreement with Hong Kong for the Surrender of Fugitive Offenders, Dec. 20, 1996, U.S.-Gr. Brit., S. Treaty Doc. No. 105-3, Article II.

## VI.   THE GOVERNMENT HAS MET ITS BURDEN OF SHOWING PROBABLE CAUSE

Ms. Chan urges that the evidence offered by the government to establish probable cause is unreliable and would be inadmissible at trial in Hong Kong. Additionally, Ms. Chan argues that the evidence is insufficient to establish probable cause.

Ms. Chan's contention that the evidence is unreliable and will be inadmissible in Hong Kong is based on the fact that most of the evidence offered by the government is in the form of hearsay, and one of the sources of information is deceased.  While Ms. Chan's allegations regarding the evidence may be true, they are not relevant to this proceeding.  The Federal Rules of Evidence do not apply in extradition proceedings on the issue of probable cause.  Ahmad, 726

F.Supp. at 415.  Evidence necessary to certify one for extradition need not be of the same quality as that necessary for trial on the merits.  Fernandez v. Phillips, 268 U.S. 311 (1925).  Hearsay evidence is admissible in an extradition proceeding.  Escobedo v. United States, 623 F.2d 1098 (5th Cir. 1980); Lopez-Smith v. Hood, 951 F.Supp. 908 (D. Ariz. 1996).  Properly authenticated documents submitted with an extradition complaint must be considered by the court in an extradition hearing regardless of their hearsay content.  In re Extradition of Marzook, 924 F.Supp. 565, 592 (S.D.N.Y. 1996).  Thus, the form of the evidence presented in these proceedings and the issues regarding the admissibility of the evidence at trial in Hong Kong will not defeat the use of the evidence in this Court's analysis of probable cause.

In an international extradition proceeding, the presiding judge need only determine whether there is any evidence sufficient to establish reasonable or probable cause that the relator committed the offense charged.  In re Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir. 1986).  The evidence showing probable cause need not be sufficient evidence to support a conviction, but need only be sufficient to warrant a finding that there are reasonable grounds to believe the relator is guilty and thus hold her for trial. Peters v. Egnor, 888 F.2d 713 (10th Cir. 1989); In re Extradition of Lin, 915 F.Supp. 206, 210 (D.Guam 1995).

A.    Findings of Fact with Regard to Probable Cause

1.    From July 1992 to March 1997, Stanley Bernard Duzy, Jr. was the Vice President Finance for the Asia Pacific Region of Honeywell Asia Pacific Limited.  Duzy Statement dated October 17, 2001 ("2 Duzy")[3] ¶ 2, III Extradition Pkg. (Doc. 6) at 836.   In the course of Mr.

---

[3]When the record contains more than one statement from a particular witness, a numeral will give the order in which it appears.  E.g. 1 Clemtns, 2 Duzy.

Duzy's employment, he hired Ms. Chan as Manager, Financial Reporting of Honeywell Asia

Pacific Inc. *Id.* ¶ 3. Ms. Chan accepted the employment offer of Honeywell Asia Pacific Inc. by

signing its offer letter. *Id.*; Letter, S. B. Duzy to Grace Chan, November 23, 1992, Doc. 6 at

839-40. Mr. Duzy was Ms. Chan's direct supervisor. 2 Duzy ¶ 3, Doc. 6 at 836.

2. On April 1, 1993, Ms. Chan became the Financial Controller for China Operations

of Honeywell, still based in Hong Kong. 2 Duzy ¶ 5, Doc. 6 at 836.

3. In the summer of 1994, a Hong Kong partnership named George, Gilbert &

Partners Design Consultant Limited ("GGPD") sought a contract to complete the new office of

Honeywell Limited in the Kowloon Bay area of Hong Kong. Lau Wai Sant Aff ¶¶ 3-4, Doc. 5 at

235. Gilbert Lau Wai-Sang, a/k/a Gilbert Lau, was one of GGPD's two partners. *Id.* ¶ 3; *see*

*also* Agreed Order Supplementing Record filed July 7, 2003 (Doc. 63) at 2, ¶ 2(c). Mr. Lau was

primarily responsible for selling GGPD's services to potential customers. Lau Wai-Sang Aff.

¶ 3, Doc. 5 at 235. GGPD's other partner was George Au Yeung Sun-chuen, a/k/a George Au

Yeung. *Id.* ¶ 3; Doc. 63 at 2 ¶ 2(b). While Mr. Au-Yeung was responsible for accounting and

project management, both partners' signatures were required on the partnership's checks. Lau

Wai-Sang Aff. ¶ 3.

4. Ms. Chan's father is Chan-Luen-au, a/k/a La Chan. *See generally* Chan Bing-ko

Aff. *Passim* & Exs. CBK-1 to -2 and -4 to -7, Doc. 6 at 791-99, 803-14 (identity cards,

background, and explanation); *see also* Doc. 63 at 2, ¶ 2(a). According to Mr. Lau, when he

visited the new Honeywell office site in an effort to get its business for GGPD, La Chan took the

keys for the premises from the estate agent, and Mr. Lau gave La Chan the material containing

information of GGPD for consideration. Lau Wai-Sang Aff. ¶ 4, Doc. 5 at 235.

5.      According to Ms. Chan's supervisor, Ms. Chan's father had "never been employed, by Honeywell, in any capacity including that of consultant." 2 Duzy ¶ 4, Doc. 6 at 836.

6.      Mr. Lau avers that, shortly after he met Ms. Chan's father, he was contacted by Ms. Chan herself and told him that she was a consultant to Honeywell Limited. Lau Wai-Sang Aff. ¶ 5-6, Doc. 5 at 236. According to Mr. Lau, Ms. Chan disclosed that she "was in fact the Financial Controller of Honeywell" before arranging for GGPD's partners to meet Honeywell's actual "Project Team." *Id.* ¶ 8. Once GGPD began to negotiate with Honeywell's authorized representatives, Mr. Lau stated that Ms. Chan "would telephone me," suggest "that we could inflate our quotations as high as possible, and asked me whether we could give her the price differences as commissions." *Id.* ¶ 9. By Mr. Lau's account, Ms. Chan told him that she had exclusive control over an upcoming renovation to a Honeywell office in Beijing, and could "give" GGPD that project. *Id.* ¶ 10, Doc. 5 at 237.

7.      According to Mr. Lau, he and Mr. Au Yeung decided to raise GGPD's bid and pay off Ms. Chan because of their desire to get the Beijing project, and because Ms. Chan could be of use on the Kowloon Bay project as she was based in Hong Kong, while the head of Honeywell's project team, Helen Rule, was overseas and would come to Hong Kong only occasionally. *Id.* Out of the total price of roughly HK $18 million that GGPD quoted to Honeywell, Mr. Lau has stated GGPD plannned to pay Ms. Chan from HK $1.1 million to HK $1.2 million. *Id.* ¶11. The Kowloon Bay contract is consistent with Mr.Lau's affirmation. The actual contract price was HK $17,277,250. Contract for Interior Construction and Fitting Out for Honeywell Limited at Part of

3/F (Unit 3), 4/F and 5/F, New Bright Industrial Building, Kowloon Bay, made August 15, 1994, recital ¶ 1 and art. 6, Doc. 5 at 245, 247.

8.      As GGPD had hoped when it agreed to pay Ms. Chang, it did obtain a contract for Honeywell's office in Beijing.  1 Duzy ¶¶2-3, Doc. 5 at 80; Contract for Interior Construction and Fitting out for Honeywell China Inc. at 34 North Donghuan Road, Beijing, made Oct. 3, 1994 (the "Beijing Contract"), *id* at 81-154.  Ms. Chan signed the Beijing Contract for Honeywell China Inc.  1 Duzy ¶ 2, Doc. 5 at 80; Beijing Contract signature page, *id.* at 88.

9.      Mr. Lau has affirmed that both his partner, Mr. Au Yeung, and Ms. Chan herself asked him to bill Honeywell for the money that GGPD then turned over to Ms. Chan.  Lau Wai-Sang Aff. ¶ 15, Doc. 5 at 238-39.   In particular, Mr. Lau specifically recalled that it was Ms. Chan who told him to bill Honeywell for the money that GGPD then turned over to Ms. Chan. Lau Wai-Sang Aff. ¶ 15, Doc. 5 at 238-39.  In particular, Mr. Lau specifically recalled that it was Ms. Chan who told him to bill Honeywell for what turned out to be HK $2.8 million on August 1, 1994.  *Id.*  18, at 239-40.   GGPD then arranged "to cover up the bribe payments to Grace Chan, " *id.*  ¶16 at 239, by transferring the funds it had obtained from Honeywell, first to an affiliated entity call George & Associates, and then to Ms. Chan's father, La Chan.  *Id.* ¶¶15-16, at 238-39. Documents obtained in the Hong Kong investigation, ¶ 10 *infra*, show that La Chan then made payments either directly to Ms. Chan or to her then-husband, James R. Stevenson,  *see* Chan Bing-ko Aff.  ¶ 4 & Ex. CBK-3, Doc. 6 at 791, 801 (relationship).

10.      With respect to the payments set out in the three count HKSAR warrant, Mr. Lau's affirmation is corroborated by affirmations and documents from Honeywell and four different banks.   Honeywell personnel described its procedures, and authenticated documents

including bills that Honeywell received from GGPD, payment vouchers in the names of both Honeywell Limited and Honeywell China Inc. that Ms. Chan signed to approve the payment of GGPD's bills, and an HK $2.8 million check to GGPD issued in accordance with a Honeywell Limited voucher that Ms. Chan had approved.  Yiu Wailing Aff. ¶¶1-12 & Exs. YWL-1 to -3, II Extradition Pkg. (Doc. 7) at 339-42, 344-55; Woo Siu Wai Aff.  ¶¶ 1-9 & Exs. WSW-1 to -4, Doc. 7 at 364-74.  The Hongkong and Shanghai Banking Corporation provided checks and bank statements showing payments for Honeywell Limited and Honeywell China, Inc. to GGPD, as well as deposit slips, statements and checks showing payments received by Ms. Chan and her then-husband, James Stevenson, from Ms. Chan's father, Chan Luen-au.  Ng Ching-ying Aff. & Exs. *passim*, Doc. 7 at 553-625.   The Bank of America produced a signature card, check, and bank statement for Honeywell Limited's payment of HK $4.6 million to GGPD on September 15, 1994.  Le Mei-kuen Aff. & Exs. *passim*, Doc. 7 at 626-38.  Checks, deposit slips and bank statements for GGPD, George & Associates, and Au Yeung came from the International Bank of Asia.  Li Yiu-fai Aff & Exs. *passim*, Doc. 6 at 639-722.   The Bank of China produced Chan Luen-au's bank statements, deposit slips, and checks.   So Hung-ngam Aff. & Exs.  *passim*, Doc. 6 at 723-89.   The accountant who testified on behalf of Ms. Chan at the extradition hearing admitted that the documents submitted by Hong Kong showed payments approved by Ms. Chan, payments received by her father, and payments that both Ms. Chan and her then-husband received from her father. Tr. 5/21/03 at 62-64, 68-69.

11.    Shortly after July 7, 1995, Ms. Chan's supervisor and two officers of Honeywell received an anonymous memorandum.  2 Duzy ¶ 6, Doc. 6 at 837, 841-45.

12.    The anonymous memorandum made several claims about Ms. Chan.  *Id*.  These

included assertions about Honeywell's payments to GGPD.  2Duzy ¶ 7, Mem., "New Office

Renovation," Doc. 6 at 837, 841-42.   Ms. Chan denied the claims about GGPD.  2 Duzy ¶10,

Doc. 6 at 837.   She then resigned from Honeywell Limited by letter dated July 17, 1995.  2 Duzy

¶¶ 11-13, Doc. 6 at 837, 846-47.

13.     Four days after resigning from Honeywell Limited, on July 21, 1995, Ms. Chan

left Hong Kong.  Chan Hui Siu-ying Aff. & Exs. *passim*, Doc. 6 at 815-32.  Her parents left five

weeks later, on August 27.  *Id.*

14.     In a preliminary review dated August 18, 1995, the Deloitte accounting firm

reported to Honeywell Limited that "HK $7.8 million was paid to [GGPD] for work of an

uncertain nature."  Seow Chow Loong Aff.  ¶ 12 & Ex. SCLI-9 at 4, ¶ 2.1.4, Doc. 7 at 379 &

425; *see also* Tr. 5/21/03 at 24-70 (testimony about report, including criticisms, by accountant

retained on behalf of Ms. Chan).

15.     At a meeting on September 15, 1995, GGPD's two partners signed a letter

admitting to Scott M. Clements of Honeywell Limited that GGPD had

> submitted false invoices to a total value of HK $9,600,000.00 for
> services and materials that were never provided to Honeywell.
> You also told us that you paid this money to Ms. Grace Chan, our
> former Financial Controller with whom you had an agreement that
> in return for her receiving money obtained by you fraudulently from
> Honeywell, she would ensure that you received further business
> from Honeywell.

Lau Wai-sang Aff. ¶ 25 & Ex. LWS-10, Doc. 5 at 241, 334; *see also* 2 Clements ¶¶ 16-20, Doc. 6

at 855-56 (Honeywell participant's description of meeting and letter).

B.   Conclusion of Law on the Issue of Probable Cause

As set forth in the findings of fact, the evidence properly submitted by Hong Kong is sufficient to sustain the charges against Ms. Chan.   While Ms. Chan has offered argument and testimony about this evidence, she did not explain it for purposes of extradition.   This Court therefore concludes that there is sufficient evidence to support a reasonable belief that Ms. Chan is guilty of the crimes charged by Hong Kong, and that the conduct of Ms. Chan, as described in the evidence submitted by Hong Kong, constitutes criminal conduct under the laws of the United States and Hong Kong.

**CONCLUSION**

IT IS THEREFORE ORDERED that Grace Chan Seong-I a/k/a/ Chan Seong-I, Grace Chan, Grace S. Chan, Grace Stevenson, Grace S. Stevenson, and Graceseong Stevenson, is committed to the custody of the United States Marshal, or his authorized representative, to be confined in appropriate facilities until she is surrendered to the Hong Kong Special Administrative Region of the People's Republic of China in accordance with the applicable provisions of the Agreement between the Government of the United States of America and the Government of Hong Kong for the surrender of Fugitive Offenders.

UNITED STATES DISTRICT JUDGE